**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

| | |
|---|---|
| PAYMAN BORHAN, | ) Case No. CV 06-06278-CAS (AS) |
| Petitioner, | ) **FINAL REPORT AND RECOMMENDATION OF** |
| v. | ) **UNITED STATES MAGISTRATE JUDGE** |
| RON DAVIS, Warden, | ) |
| Respondent. | ) |

This Final Report and Recommendation is submitted to the Honorable Christina A. Snyder, United States District Judge, pursuant to 28 U.S.C. § 636 and General Order 01-13 of the United States District Court for the Central District of California.

**I.    INTRODUCTION**

On September 22, 2006, Payman Borhan ("Petitioner"), a California state prisoner who is represented by counsel, filed a Petition for Writ of Habeas Corpus("Petition") pursuant to 28 U.S.C. § 2254 in the United States District Court for the Southern District of California.  (Docket

1

Entry No. 1).  The Petition was subsequently transferred to this Court. (Docket Entry No. 2).

On October 15, 2014, (following an evidentiary hearing and the consideration of various briefs filed by the parties, including Respondent's Return to the Petition ("Return"); see Docket Entry No. 174), the Court found that Petitioner was entitled to equitable tolling of the statute of limitations and that the Petition should not be dismissed as untimely filed.[1]  See Amended Findings and Conclusion; Docket Entry No. 180.  The Court incorporates the "proceedings" section of the Amended Findings and Conclusion, setting forth the procedural history of this action.  Id.

On November 13, 2014, Respondent filed Objections to the Amended Findings and Conclusion.  (Docket Entry No. 183).

On January 5, 2015, Petitioner filed a Reply in Support of the Amended Findings and Conclusion Granting Equitable Tolling (Docket Entry No. 187), and a Traverse.  (Docket Entry No. 188).

In the Traverse, Petitioner discussed the merits of three of the five claims alleged in the Petition and requested that the brief he had filed in support of the Petition ("Brief") on November 13, 2006 (see Docket Entry No. 8), be deemed filed *nunc pro tunc* on the day the

[1]     Former Magistrate Judge Stephen Hillman held an evidentiary hearing and made credibility findings in support of the Court's Amended Findings and Conclusion.  After Judge Hillman's retirement, the matter was transferred to the undersigned Magistrate Judge on April 14, 2015.

Petition was filed.[2]  Alternatively, Petitioner requested that the Court grant his Motion to Amend the Petition, which had been filed on July 6, 2007 (seven months after the Court advised Petitioner about filing an amended petition), and the proposed First Amended Petition and Brief in Support of the First Amended Petition, which was also lodged on July 6, 2007 (see Docket Entry No. 23).[3]  Petitioner's requests concerned his desire to pursue the claim that his trial counsel was ineffective for failing to request a lesser-included offense instruction. (See Traverse at 2-3 n.1, 7-8, 24-28).

On January 7, 2015, the Court ordered Respondent to file a Response addressing Petitioner's requests, and noted that Respondent's

___

[2]   The Brief provided points and authorities supporting the five claims alleged in the Petition and also raised two claims that were *not* alleged in the Petition, namely, ineffective assistance of counsel based on trial counsel's failure to request a lesser-included offense instruction, and appellate counsel's failure to raise claims on appeal.

On November 16, 2006, the Court rejected the Brief for filing because (1) it was not submitted with the Petition; (2) it was submitted *after* Respondent had already filed an Answer to the Petition; and (3) it alleged claims that were not alleged in the Petition.  Petitioner was advised that if he wished to file an amended petition, he must file a motion to amend the Petition, accompanied by an amended petition, within twenty days.  (Docket Entry No. 11).  The Court's subsequent minute orders - dated January 26, 2007 and May 16, 2007 - noted that Petitioner had *not* filed a motion to file an amended petition. (Docket Entry Nos. 12, 20).

[3]   Petitioner's motion to amend the Petition included the following new claims: Petitioner received ineffective assistance of counsel based on his trial counsel's failure to request the lesser-included offense instruction and his appellate counsel's failure to raise on appeal the trial court's failure to *sua sponte* instruct on the lesser-included offense and the trial court's admission of propensity evidence.

On October 12, 2007, the Court denied the Motion to Amend the Petition, finding that because the new claims alleged in the proposed First Amended Petition did not relate back to the Petition, the proposed First Amended Petition would be time barred. (Docket Entry No. 35).

Objections to the Amended Findings and Conclusion did not cause the Court to change its finding regarding Petitioner's entitlement to equitable tolling. (Docket Entry No. 189). The Court incorporates the Amended Findings and Conclusion Following Evidentiary Hearing, including former Magistrate Judge Hillman's credibility findings in this Report and Recommendation.

On February 24, 2015, Respondent filed a Response to the Traverse. (Docket Entry No. 195).[4]

---

[4] Petitioner's request that the Brief be deemed filed *nunc pro tunc* on the day the Petition was filed is DENIED. Although Petitioner requests a *nunc pro tunc* order based on the failure of his counsel (Lisa Bassis) to file the Brief at the time the Petition was filed, which he claims his counsel intended to do (see Traverse at 2-3; Supporting Reply at 2-7), he has failed to cite any authority supporting the issuance of such an order under the circumstances in this case.

As noted in footnote 2 *supra*, the Court rejected the Brief for filing because it contained claims that were not alleged in the Petition and therefore needed to be raised in an amended petition. Since the rejection for filing of the Brief was not the result of the Court's mistake or inadvertence, a *nunc pro tunc* order is not warranted. See United States v. Sumner, 226 F.3d 1005, 1010 (9th Cir. 2000)("'*Nunc pro tunc* amendments are permitted primarily so that errors in the record may be corrected. The power to amend *nunc pro tunc* is a limited one, and may be used only where necessary to correct a clear mistake and prevent injustice.' . . . It does not imply the ability to alter the substance of that which actually transpired or to backdate events to serve some other purpose . . . Rather, its use is limited to making the record reflect what the district court actually intended to do at an earlier date, but which it did not sufficiently express or did not accomplish due to some error or inadvertence."). The Court declines to revisit its earlier ruling.

Petitioner's alternative request that the Court grant the Motion to Amend the Petition is also DENIED. As the Court has already found (see Docket Entry No. 35), the proposed First Amended Petition (which was lodged approximately nine or ten months after the filing of the Petition, depending on whether the filing date was October 2, 2006 or September 5, 2006, see Amended Findings and Conclusion at 13-14 n.12) contained claims, including the ineffective assistance of trial counsel claim Petitioner now seeks to pursue, which do not relate back to the claims alleged in the Petition. See also Schneider v. McDaniel, 674 F.3d 1144, 1150-51 (9th Cir. 2012). Although the Court has found that
(continued...)

4

On March 2, 2015, Petitioner filed an Application for Leave to File a Reply to the Traverse. (Docket Entry No. 197).

---

[4] (...continued)
the Petition was not untimely based on Petitioner's entitlement to equitable tolling through the date of the filing of the Petition (based on attorney misconduct amounting to abandonment), Petitioner has not asserted, or attempted to show, that equitable tolling is warranted through the date on which the proposed First Amended Petition was lodged. Indeed, the reasons given by Petitioner for needing extensions of time to file a Motion to Amend the Petition included problems with his counsel's mail delivery, a death in his counsel's family, and his counsel's involvement in an automobile accident, all of which are unrelated to attorney misconduct. Since the new claims alleged in the proposed First Amended Petition would be time barred, amendment of the Petition would be futile. See Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995)("Futility of amendment can, by itself, justify the denial of a motion for leave to amend."); Waldrip v. Hall, 548 F.3d 729, 732 (9th Cir. 2008).

In any event, to the extent that Petitioner is really seeking to pursue the claim that he received ineffective assistance of counsel based on his trial counsel's failure to request a lesser-included offense instruction, the Court - out of an abundance of caution - will address that claim on the merits, even though this claim is not technically before the Court. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."); See Berghuis v. Thompkins, 560 U.S. 370, 390 (2010) ("Courts can . . . deny writs of habeas corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review"); Norris v.Morgan, 622 F.3d 1276, 1290 (9th Cir. 2010) (affirming denial of habeas corpus petition when claim failed even under de novo review).

In the Objections, Petitioner challenges the Court's decisions to reject the Brief for filing, to deny Petitioner's request that the Brief be deemed filed nunc pro tunc on the day the Petition was filed, and to deny Petitioner's alternative request that the Court grant the Motion to Amend the Petition. (see Objections at 2-8). Petitioner's assertions do not cause the Court to alter its decisions. Moreover, as noted above, the Court does address Petitioner's claim that his trial counsel provided ineffective assistance in failing to request a lesser-included offense instruction. Finally, since Petitioner does not discuss the claim alleging ineffective assistance of appellate counsel in the Brief or proposed First Amended Petition, the Court finds that Petitioner has apparently abandoned that claim.

On March 4, 2015, the Court granted Petitioner's Application for Leave to File a Reply to the Traverse, and ordered Petitioner to specify which new claim(s) he now wishes to pursue and the exact page and lines of the California Supreme Court pleadings on which the new claim(s) were alleged. (Docket Entry Nos. 197-198). On March 6, 2015, the Court ordered Petitioner to also address the following in his Reply to the Traverse: (1) whether the cumulative impact of counsel's deficiencies is being alleged as a stand-alone claim, and if so, the exact page and lines of the California Supreme Court pleadings on which such claim was alleged; and (2) if Petitioner is not alleging that this is a stand-alone claim, the authority supporting the Court's ability to address this claim. (Docket Entry No. 199).

On March 25, 2015, Petitioner filed a Reply in Support of his Traverse ("Supporting Reply"). (Docket Entry No. 200).

On July 13, 2015, Respondent filed a Response to the Supporting Reply. (Docket Entry No. 210).[5]

---

[5] The Court finds that the claim Petitioner wishes to pursue -- ineffective assistance of counsel based on his trial counsel's failure to request a lesser-included offense instruction -- *was* presented in a habeas petition filed with the California Supreme Court on October 7, 2004 (Case No. S128321). See Supporting Reply at 3-4, citing inter alia Respondent's July 24, 2007 Notice of Lodging No. 15 at 5, 39 and 41). The California Supreme Court summarily denied that habeas petition without citation to authority on June 8, 2005. (See Respondent's July 24, 2007 Notice of Lodging No. 16). As set forth *infra* (Section V), Petitioner also raised this claim in a habeas petition filed in the California Supreme Court on July 9, 2007 (Case no. 154266), which was denied with a citation to In re Robbins and In re Clark on January 3, 2008. (See Respondent's July 24, 2007 Notice of Lodging, Nos. 23-24; Respondent's September 24, 2014 Notice of Lodging No. 5).

Since Petitioner is not alleging the cumulative impact of counsel's deficiencies as a stand-alone claim (see Supporting Reply at
(continued...)

On March 28, 2017, the Court issued a Report and Recommendation, recommending the denial of the Petition on the merits. (Docket Entry No. 14).

On May 2, 2017, Petitioner filed Objections to the Report and Recommendation ("Objections"). (Docket Entry No. 218).

The Court now issues this Final Report and Recommendation to address the Objections. For the reasons discussed below, it is recommended that the Petition be DENIED and that this action be DISMISSED with prejudice.

//

//

---

[5] (...continued) 11-12), the Court will not address it separately.

In the Objections, Petitioner challenges the Court's decision not to separately address Petitioner's claim concerning the cumulative impact of his trial counsel's deficiencies. (See Objections at 11-14). Petitioner's assertions do not cause the Court to change its decision. Moreover, even if the Court were to examine the cumulative impact of trial counsel's alleged deficiencies -- namely, trial counsel ineffectiveness for failing to interview and/or call witnesses, advising Petitioner not to testify, and failing to request a lesser-included offense instruction -- the Court has found that Petitioner has not suffered any "prejudice" as a result of these alleged deficiencies (see Final Report and Recommendation at pages 51-58), and the Court would find that the combined effect of these deficiencies did not result in "prejudice." See Villafuerte v. Stewart, 111 F.3d 616, 632 (9th Cir. 1997) ("Villafuerte has failed to demonstrate that he suffered prejudice as a result of any such alleged deficiencies. The combined effect of any deficiencies also did not result in prejudice."); Sully v. Ayers, 725 F.3d 1057, 1075 (9th Cir. 2013) ("Given that the California Supreme Court was not necessarily unreasonable in concluding that Sully was not prejudiced by any of alleged [counsel's] errors in isolation, it was also not necessarily unreasonable in concluding that Sully was not prejudiced by the alleged errors in the aggregate.").

## II. PRIOR PROCEEDINGS

On December 10, 2002, a Los Angeles County Superior Court jury found Petitioner guilty of two counts of committing a lewd act upon a child under the age of fourteen years in violation of California Penal Code ["P.C."] § 288(a).[6]  In addition, the jury found true the special allegations that Petitioner had committed the offenses on more than one victim at the same time and in the same course of conduct (P.C. §§ 1203.066(a)(7), 667.61(b)).  (See Clerk's Transcript ["CT"] 149-53; 4 Reporter's Transcript ["RT"] 1204-06).  On March 11, 2003, after denying Petitioner's motion for a new trial, the trial court sentenced Petitioner to state prison for concurrent terms of 15 years to life. (See CT 187-88, 193-94; 4 RT 1802-04, 1806-07).

The Court incorporates the statements from the "Procedural History" section of the Amended Findings and Conclusion.[7]

---

[6]   P.C. § 288(a) provides that "any person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child is guilty of a felony[.]"

[7]   In the Amended Findings and Conclusion, the Court failed to state that Petitioner's July 19, 2004 California Supreme Court habeas petition (Case No. S126391) alleged inter alia the same claim as the third claim alleged in the Petition.  On June 8, 2005, the California Supreme Court summarily denied the petition.  (See Respondent's July 24, 2007 Notice of Lodging Nos. 13-14).  Therefore, Petitioner's claims of ineffective assistance of trial counsel for failure to interview and/or call witnesses, and for advising Petitioner not to testify were presented to the California Supreme Court and are therefore exhausted.

Respondent has lodged a document reflecting that the California Supreme Court denied Petitioner's July 9, 2007 California Supreme Court habeas petition with citation to In re Robbins, 18 Cal.4th
(continued...)

## III. FACTUAL BACKGROUND

Petitioner is not challenging the sufficiency of the evidence to support his conviction. The following summary is taken from the "Factual Background" section of the California Court of Appeal's Opinion on direct appeal. (Respondent's July 24, 2007 Notice of Lodging ["July 24, 2007 Lodgment"] No. 8 at 2-6)[8]:

### A. The charged offenses

. . . On approximately March 1, 2000, Valene L. and Gelesia M. were 10 years old. Valene and Gelesia were cousins. Defendant installed a water filtration system at Valene's father's home that day. Defendant told Valene: "You are a beautiful young lady. Would you like to be in a commercial?" Valene responded affirmatively. Defendant later came to Valene's mother's home for an interview and "audition." Defendant demonstrated dance steps for Valene to use in the alleged commercial. After about 10 minutes, Valene's mother left to do laundry. However, Valene's 16-year-old sister, Vanessa was present. Valene's brother was also present for part of the time. At one point, defendant had Valene sit on his lap and say, "I love you, Daddy." Defendant instructed Valene to do a "cheerleading kind of

---

[7] (...continued)
770, 780 (1998) and <u>In re Clark</u>, 5 Cal.4th 750 (1993). (<u>See</u> Respondent's September 24, 2014 Notice of Lodgement No. 5).

[8] Factual determinations by the state court are presumed correct and can be rebutted only by clear and convincing evidence. <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1168 (9th Cir. 2002).

routine." Thereafter, defendant danced with Valene. As they danced, defendant placed his leg between her legs. The top of defendant's knee touched Valene's vaginal area for approximately seven seconds. Valene believed defendant intentionally touched her. Valene became uncomfortable and scared because she knew she should not be touched there.

Shortly thereafter, Valene saw Gelesia arrive. Valene called Gelesia into the kitchen. Defendant told Valene and Gelesia to stand straight. Defendant told the two girls they were not standing up straight. Thereafter, defendant placed his open hands, palm up underneath Valene's breasts and pushed upwards for six or seven seconds. Valene was very uncomfortable. Valene also believed defendant intentionally touched her breasts. Valene also believed defendant intentionally touched Gelesia's breasts. Defendant also placed one hand on Valene's upper breast area and his other hand on her back shoulder blade to straighten her posture. Valene testified as to what happened next, "I told him that I wanted to go and tell my mother something." Valene then testified, "I went outside and told my mother." Valene's mother told defendant they had to go somewhere. Thereafter, Valene's mother telephoned the police.

Gelesia recalled being present from the beginning of Valene's audition. Valene's mother encouraged Galesia to join in the "audition." Gelesia saw defendant touch Valene inappropriately with his leg. Gelesia also saw defendant

place both of his hands underneath Valene's breasts and lift up. Defendant was smiling at the time. Gelesia thought Valene appeared uncomfortable. During the skit, defendant had Valene repeatedly say, "Oh, Daddy." Defendant simultaneously placed his leg between Valene's legs and touched her "private parts" or vaginal area with his knee. Valene looked very uncomfortable again. Defendant also told Gelesia to stand up straight and placed his hands underneath her breasts and lifted up. Gelesia felt "very weird" and uncomfortable that someone unknown to her had touched her. Gelesia knew that what defendant was doing was wrong. Gelesia believed defendant's acts were intentional. Gelesia did not say anything because she was scared and nervous.

Vanessa L. is Valene's sister. Vanessa saw defendant place his hand underneath Valene's breast for approximately five seconds. Defendant looked happy at the time. Vanessa also saw defendant place his leg between Valene's legs. It appeared to Vanessa that defendant's knee area touched Valene's private area for five or six seconds. Valene looked very serious and uncomfortable. Vanessa was not present during the entire time defendant was auditioning her sister.

Jose Gonzalez was the president of Continental Water Softener Company in March 2000. Defendant was a subcontractor for Mr. Gonzalez's company at that time selling water purification systems. The company was not in the process of making any commercials or advertisements at that time.

Defendant was not authorized to audition anyone for commercials or modeling advertisements.

### B. The uncharged crimes

In July 1998, Cynthia T. was 23 years old. Defendant drove by Ms. T's home. Defendant told her he was a talent scout for the Ford Modeling Agency looking for models for commercials. Defendant gave Ms. T. his business card. Defendant later auditioned Ms. T. at her home. Defendant showed Ms. T. a portfolio of photos of different "girls" with whom he worked. Defendant had Ms. T. read a few lines and walk back and forth. Defendant got behind her. Defendant moved his hands up and down Ms. T.'s body and instructed her how to move. Defendant cupped Ms. T.'s breasts then moved his hands up and down her chest and waist area. Ms. T. was uncomfortable. Defendant also touched Ms. T.'s breast as he ostensibly tried to straighten her posture. Later, defendant had Ms. T. do a love scene where she was to kiss him. Defendant repeatedly told Ms. T. to kiss him. Defendant kissed Ms. T. and placed his tongue in her mouth. Ms. T. backed off in surprise. Ms. T.'s mother entered the room. Ms. T.'s mother screamed at defendant and told him to leave.

In August 1998, Song L. was approached by defendant as he drove in her neighborhood. Defendant stopped Ms. L. as she was on the sidewalk. Defendant said he owned a water business and was looking for actresses for a commercial. Ms. L. was 21 years old. Defendant went to Ms. L.'s apartment to audition

her.  Defendant told her he was going to do a dance routine with her because that would be used in a commercial for a water company.  After a few dance spins and dips, defendant stood behind Ms. L. and placed one hand over her chest and inside her bra.  Defendant placed his other hand on her groin area.  When Ms. L. asked what he was doing, defendant responded: "Oh, it's okay.  It's okay."  Ms. L. managed to free herself from that position.  Ms. L. told defendant she no longer wanted to participate in the "audition."  Ms. L. believed defendant grabbed her breast intentionally as he restrained her.  Defendant had also asked her to rehearse kissing him.  Ms. L. did not want to do so.  Ms. L. also believed defendant intentionally pressed down hard on her pubic area.  Defendant had also attempted to straighten Ms. L.'s posture.

Also during August 1998, defendant went to the home of Brenda C. for an audition for commercials.  Ms. C. met defendant through her sister, whom he had initially approached.  Ms. C.'s parents were present when defendant arrived at 9 p.m.  Following instructions, defendant asked Ms. C.'s parents to leave the room so they would not influence the audition.  Defendant had a photo portfolio with pictures of other young women.  Defendant showed Ms. C. how to walk and stand up straight by using his hand behind her back.  Defendant used his other hand to lift her breast.  Defendant lifted her breast up several times.  Initially, Ms. C. did not feel anything was "weird."  Defendant also showed Ms. C. how

13

to tango.  As he held her back he placed his leg between her legs.  At another time during the dancing, defendant's hand slipped into her shirt under her bra.  Defendant's hand touched Ms. C.'s right breast.  Ms. C. felt uncomfortable but thought it was "procedure."  Ms. C. believed defendant intentionally put his hand under her bra and grabbed her.  Ms. C. pushed defendant away.  Defendant then had Ms. C. to act excited about having won a car, run up to him, and then hug him.  After repeating that several times, defendant told Ms. C. to tell him how much she loved him and hold his face next to hers.  When Ms. C. did so, he grabbed her face and stuck his tongue in her mouth.  Ms. C. was "disgusted" and pushed him away.  When Ms. C. refused to repeat that "move," defendant told her she had passed the audition.

## IV.   PETITIONER'S CLAIMS

Petitioner raises the following claims for federal habeas relief:

Ground One:    The trial court's denial of Petitioner's motion for a continuance to retain counsel and motion for substitute retained counsel violated Petitioner's Sixth Amendment rights.  (Petition at 5; Traverse at 32-38).

Ground Two:    The trial court's admission of propensity evidence under California Evidence Code § 1108 violated Petitioner's rights to due process and a fair trial.  (Petition at 5).

14

Ground Three:    Petitioner received ineffective assistance of counsel based on (A) his trial counsel's failure to interview and/or call witnesses; and (B) his trial counsel's advising Petitioner not to testify.  (Petition at 6; Traverse at 4-24).[9]

Ground Four:     The trial court's failure to *sua sponte* instruct the jury on the lesser-included offense of annoying or molesting a child violated Petitioner's rights to due process and a fair trial.  (Petition at 6).

Ground Five:     Petitioner's sentence constituted cruel and unusual punishment under the Eighth Amendment.  (Petition at 6; Traverse at 38-42).

## V.   STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not grant habeas relief on a claim adjudicated on its merits in state court unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as

---

[9]    Although Petitioner also alleged that his trial counsel was ineffective for inhibiting Petitioner's ability to seek new counsel (see Petition at 6), Petitioner has apparently abandoned that portion of his ineffective assistance of trial counsel claim (see Traverse at 7-8).

As set forth in footnote Nos. 4-5, *supra*, the Court will address the merits of Petitioner's claim that he received ineffective assistance counsel based on his trial counsel's failure to request a lesser-included offense instruction (Ground Three (C). (See Traverse at 8, 24-28; Supporting Reply at 9-11).

15

determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]'" Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citations omitted).

The term "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003); see also Cullen v. Pinholster, 563 U.S. at 182; Williams v. Taylor, 529 U.S. 362, 412 (2000)("clearly established Federal law" consists of holdings, not dicta, of Supreme Court decisions "as of the time of the relevant state-court decision"). However, federal circuit law may still be persuasive authority in identifying "clearly established" Supreme Court law or in deciding when a state court unreasonably applied Supreme Court law. See Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011); Tran v. Lindsey, 212 F.3d 1143, 1154 (9th Cir. 2000).

A state court decision is "contrary to" clearly established federal law if the decision applies a rule that contradicts the governing Supreme Court law or reaches a result that differs from a result the Supreme Court reached on "materially indistinguishable" facts. Early v. Packer, 537 U.S. 3, 8 (2002) (per curiam); Williams, 529 U.S. at 405-06; see also Cullen v. Pinholster, supra ("To determine whether a particular decision is 'contrary to' then-established law, a federal

16

court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court."). When a state court decision adjudicating a claim is contrary to controlling Supreme Court law, the reviewing federal habeas court is "unconstrained by § 2254(d)(1)." Williams, 529 U.S. at 406. However, the state court need not cite the controlling Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." Early, supra.

A state court decision involves an "unreasonable application" of clearly established federal law "if the state court either unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Williams, 529 U.S. at 407; Cullen v. Pinholster, supra; Woodford v. Visciotti, 537 U.S. 19, 24-27 (2002)(per curiam); Moore v. Helling, 763 F.3d 1011, 1016 (9th Cir. 2014)(courts may extend Supreme Court rulings to new sets of facts on habeas review "only if it is 'beyond doubt' that the ruling apply to the new situation or set of facts."), cert. denied, 135 S.Ct. 2361 (2015). A federal habeas court may not overrule a state court decision based on the federal court's independent determination that the state court's application of governing law was incorrect, erroneous or even "clear error." Lockyer, 538 U.S. at 75; Harrington v. Richter, 562 U.S. 86, 101 (2011)("A state court's determination that a claim lacks merit precludes federal relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."). Rather, a decision may be rejected only if the state court's application of Supreme Court law was "objectively unreasonable." Lockyer, supra; Woodford, supra;

17

Williams, 529 U.S. at 409; see also Taylor v. Maddox, 366 F.3d 992, 999-1000 (9th Cir. 2004)("objectively unreasonable" standard also applies to state court factual determinations).

When a state court decision is found to be contrary to or an unreasonable application of clearly established Supreme Court law, a federal habeas court "must then resolve the [constitutional] claim without the deference AEDPA otherwise requires." Panetti v. Quarterman, 551 U.S. 930, 953 (2007). In other words, if a § 2254(d)(1) error occurs, the constitutional claim raised must be considered *de novo*. Frantz v. Hazey, 513 F.3d 1002, 1012-15 (9th Cir. 2008); see also Rompilla v. Beard, 545 U.S. 374, 390 (2005). *De Novo* review is also required when a claim is rejected by the state court on procedural rather than substantive grounds, see Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002), and when it is clear that the state court has not decided an issue. Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006).

When the state court has not provided a reasoned explanation for its denial of the Petitioner's claims, a federal court has no basis other than the record for knowing whether the state court correctly identified the governing legal principle or was extending the principle into a new context. See Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000). Thus, "[f]ederal habeas review is not de novo when the state court does not supply reasoning for its decision, but an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. . . . Only by that examination may we determine whether the state

court's decision was objectively reasonable." Id. at 982.

Petitioner raised the claims raised in Ground One, Ground Two, and Ground Five in his October 7, 2004 habeas petition to the California Supreme Court (Case No. S128321) (see July 24, 2007 Lodgment No. 15), and Ground Three (A) and (B) in his July 19, 2004 habeas petition to the California Supreme Court (Case No. S126391) (see July 24, 2007 Lodgment No. 13), which denied these claims without citation to authority on June 8, 2005 (see July 24, 2007 Lodgment Nos. 14, 16). The Court "looks through" the California Supreme Court's silent denial to the last reasoned decision as the basis for the state court's judgment. See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991) ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground."); Cannedy v. Adams, 706 F.3d 1148, 1159 (9th Cir. 2013) ("[W]e conclude that Richter does not change our practice of 'looking through' summary denials to the last reasoned decision – whether those denials are on the merits or denials of discretionary review."; footnote omitted), as amended, 733 F.3d 794 (9th Cir. 2013). Therefore, in addressing Grounds One, Two and Three (A) and (B), the Court will consider the California Court of Appeal's reasoned opinion on direct appeal (see Lodgment No. 8). See Berghuis v. Thompkins, 560 U.S. 370, 380 (2010).

The California Court of Appeal denied Ground Two on procedural grounds. (See July 24, 2007 Lodgment No. 8). Petitioner raised the claims in Ground Three (C) and Ground Four in his July 9, 2007 habeas petition to the California Supreme Court (Case No. 154266) (see July 24,

19

2007 Lodgment Nos. 23-24), which, on January 3, 2008, denied the claims with citations to In re Robbins, 18 Cal.4th 770, 780 (1998) and In re Clark, 5 Cal.4th 750, 767-69 (1993) (see Respondent's September 24, 2014 Lodgment No. 5). Accordingly, the Court will conduct a de novo review of Grounds Two and Four and also determine, alternatively, whether Grounds Two and Four are procedurally defaulted.

However, since no state court has provided a reasoned opinion addressing the merits of Ground Three (C) and Ground Five, this Court must conduct "an independent review of the record" to determine whether the California Supreme Court's ultimate decision to deny these claims was contrary to, or an unreasonable application of, clearly established federal law. See Murray v. Schriro, 745 F.3d 984, 996-97 (9th Cir. 2014); Walker v. Martel, 709 F.3d 925, 939 (9th Cir. 2013).

## VI. DISCUSSION

**A.    Denials of Motion for a Continuance to Retain Counsel and Motion for Substitute Counsel**

In Ground One, Petitioner contends that the trial court denied his motion for a continuance to retain counsel and his motion for substitute counsel in violation of his Sixth Amendment rights. (Petition at 5; Traverse at 32-38).

1.    The Record Below

At the conclusion of the preliminary hearing on August 12, 2002,

20

Petitioner's retained counsel made a request to be relieved. When the court asked whether counsel was retained for purposes of the preliminary hearing only, counsel responded that he was retained by the family, and that all he could say due to attorney-client privilege was that he needed to be relieved as a result of some conflict. The court denied counsel's request to be relieved without prejudice, based on Petitioner's failure to specify the nature of the conflict. (See CT 3-77).

On August 26, 2002 (the date on which the arraignment was scheduled), a deputy public defender was appointed to represent Petitioner. At that hearing, Petitioner waived time for trial and arraignment. (See CT 83).

At the arraignment on September 4, 2002, Petitioner was represented by Deputy Public Defender Kenneth Wenzl. Jury trial was scheduled for October 21, 2002. (See CT 84).

At a readiness hearing on October 17, 2002, Petitioner was represented by Mr. Wenzl. Jury trial was continued to November 19, 2002. (See CT 85).

At another readiness hearing on November 15, 2002, Petitioner was represented by Mr. Wenzl. Petitioner failed to appear, but he had a sufficient excuse. The jury trial remained scheduled for November 19, 2002. (See CT 86).

On November 19, 2002, Petitioner was present "in lock up" and

represented by Mr. Wenzl. Jury trial was trailed to November 26, 2002. (See CT 87).

On November 26, 2002, Petitioner was present "in lock up" and represented by Mr. Wenzl. Pursuant to a defense motion, jury trial was trailed to December 3, 2002. (See CT 88).

On December 3, 2002, Petitioner was present "in lock up" and represented by Mr. Wenzl. Jury trial was trailed to December 4, 2002. (See CT 89).

On December 4, 2002, Petitioner was present "in lock up" and represented by Mr. Wenzl. The matter was transferred to Division 7 for a jury trial. (See CT 90).

That afternoon, the case was called for a jury trial. In Petitioner's presence, a panel of prospective jurors were given a perjury admonishment. Immediately thereafter, Petitioner stated he needed to speak to the trial court. The trial court told Petitioner, "We'll get to that," and continued to address the prospective jurors about procedures. Petitioner interrupted the trial court, stating, "My family's bringing a private lawyer. I really do not wish to go to the trial." The trial court responded, "This case is going to be tried in this courtroom and tried today." Petitioner again spoke out: "Excuse me. It has -- it has not been communicated -- [¶] [¶] He has not seen me since yesterday. My public defender has not come to see me sir. I have been wanting to talk to him since yesterday that I don't want to go through to trial because last night -- night -- I talked [to] my family.

My mother of my daughter from Mexico called, and she's bringing -[.]"
The trial court appeared to interrupt, stating, "Sir, we're going to try
this lawsuit in this courtroom. Today. And I don't want you to say
another word now while the jurors are in the courtroom. Not one more
word." Because Petitioner continued to interrupt, the trial court asked
the prospective jurors to leave the courtroom. (See CT 91; 2 RT 2-3).

Out of the prospective jurors' presence, the trial court advised
Petitioner that the trial would go forward. The trial court then
stated: "You happen to be represented by one of the best public
defenders in our district who's been in my court for years numerous
times, and I'm not going to accept any comments from you on the date of
trial about the ineffective assistance of your lawyer." The trial court
continued: "[Y]ou are telling me today that on the day of trial, the
last day of trial, that you've got somebody that's ostensibly bringing
in another attorney to represent you. It's not accepted by me. This
matter came from another department. It -- it was answered ready. It's
going to be tried." The trial court admonished Petitioner not to speak
out when court was in session, and that any further misbehavior by
Petitioner would result in his removal from the courtroom. The trial
court stated, "I'm not going to hear anything else about continuance of
this trial on this." (See 2 RT 3-4).

When Petitioner was given the opportunity to speak, he mentioned a
past manic-depression diagnosis and two past felony convictions (which
he stated could have been two misdemeanor convictions, but for his
refusal to agree to the plea because of his mental condition), and
stated, "Yesterday, okay, Mr. Wenzl came and brought me the -- . . . I

23

had not seen Mr. Wenzl since about two months, or two months ago."
After mentioning that he had received psychiatric treatment and
medication following an attempted suicide, Petitioner stated, "So
yesterday I see Mr. Wenzl after two months, and he comes and he say, oh,
we finally got the doctor report; and doctor suggests . . . send[ing]
you to a [psychiatric] program. . . . We are going to get you to a
program." Petitioner stated that Mr. Wenzl told him that it would take
perhaps one year to get Petitioner into a program and that he would talk
to the deputy district attorney about it. However, when Mr. Wenzl spoke
to the deputy district attorney about the program, he was told that
Petitioner would have to face a trial because of his two prior felony
convictions. After Petitioner stated that there was a conflict of
interest between himself and Mr. Wenzl, the trial court asked the
prosecutor to leave the courtroom in order to conduct a <u>Marsden</u>[10]
hearing. (<u>See</u> 2 RT 4-7).

At the hearing, Petitioner claimed there was a conflict of interest
for the following reasons: (1) he had asked Mr. Wenzl to interview four
people, but Mr. Wenzl had only interviewed one person (who did not
provide the answers Petitioner was looking for); (2) he wanted Mr. Wenzl
to have a psychiatrist testify at trial but Mr. Wenzl did not want this
since it would not help Petitioner's case; and (3) Petitioner wanted Mr.
Wenzl to bring a "95" motion for dismissal or reduction and Mr. Wenzl
refused to do so. Petitioner moved for the appointment of another
public defender and, alternatively, for permission to hire a private

---

[10] <u>People v. Marsden</u>, 2 Cal.3d 118, 122-24 (1970). In
California, a motion for substitute counsel is called a "Marsden
motion." <u>Schell v. Witek</u>, 218 F.3d 1017, 1021 (9th Cir. 2000).

attorney. After the trial court confirmed that Petitioner was moving to discharge Mr. Wenzl and obtain another attorney, the trial court denied the motion.

Mr. Wenzl denied Petitioner's assertion that he had not seen Petitioner for two months. Mr. Wenzl stated that he had spoken to Petitioner yesterday about part of a confidential psychiatrist's report, which recommended Petitioner's participation in a program. After speaking to Petitioner, he spoke to the prosecutor about the psychiatrist's report to see if she would agree to give Petitioner a suspended sentence and entry into the program, but the prosecutor did not feel the program was appropriate. Mr. Wenzl stated that he then told Petitioner that the prosecutor did not feel the program was appropriate and that Petitioner's options were to either accept the prosecutor's 10-year offer or proceed to trial. Mr. Wenzl stated that Petitioner had refused the 10-year offer. Following Mr. Wenzl's statements, the trial court stated, "Motion to appoint another attorney is denied. Motion to continue is denied. I'm denying those motions, and I'm not going to hear anymore (sic) motions." (See 2 RT 8-12; see also 2 RT 14; CT 91).

Petitioner then asked if he could retain a private attorney, stating that his daughter's mother in Mexico had told him last night that she would send him money (obtained from the sale of machines), and that his fiancé in Canada had also told him she would send him money (borrowed). After the trial court responded, "Not timely," Petitioner stated that he did not know there was going to be a trial until yesterday (when he was apparently told he was not going to be accepted

25

into a program). Petitioner talked about his mental health and his family concerns. After listening to Petitioner's rambling statements, the trial court stated, "I'm going to instruct my reporter to not report anything else that [Petitioner] says. He's attempting to obstruct these proceedings -- he's attempting to obstruct the proceeding. We're going to call the jury back inside. We're going to select the jury . . . We're going to select a jury and call witnesses, and then the trial will ensue; and the trial will begin, and the trial will end. And I'm not going to continue the case, and I'm not going to let you bring another lawyer on the last day of ten days of ten." Petitioner stated, "All I want is two months." The trial court replied, "I don't care what you want. It's denied. And I don't want to hear another word from you." Petitioner stated that the trial could not start, and alluded to his prior case in which he was forced to accept a felony charge for a misdemeanor. The trial court stated that, since it appeared Petitioner was going to obstruct proceedings, Petitioner needed to be taken to another place. (See 2 RT 13-16; CT 91-92).

Following a recess, the trial court told Petitioner that his options were to either sit quietly during the trial, or to continue to interfere and then be gagged in front of the jury panel or be removed from the courtroom. Petitioner again stated that he wanted to have another lawyer. The trial court responded, "You can't have another lawyer. You can't continue this case." The trial court added that Petitioner had not stated any grounds for discharging Mr. Wenzl. Petitioner then repeated that he wanted a psychologist to testify at trial. The trial court responded that it was Mr. Wenzl's decision. After Petitioner stated that he had asked Mr. Wenzl if Petitioner could

26

bring in a private attorney to work jointly with Mr. Wenzl, the trial court stated it did not care whether somebody else came in, since Mr. Wenzl was his attorney. Petitioner stated that last night he had called about bringing another attorney to help or replace Mr. Wenzl, and that Petitioner was trying to get the money to do so. Jury selection continued. (See 2 RT 17-20; CT 91-92).

The following day, Petitioner immediately stated, "Pardon me, your Honor. Excuse me. I see the private counsel my family brought has left. I'm putting my trust in God, and I am going to continue." (See 2 RT 301).

    2.   <u>Legal Authority</u>

    a.   Motion for a Continuance to Retain Counsel

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." <u>McNeil v. Wisconsin</u>, 501 U.S. 171, 175 (1991). A defendant who can afford to retain counsel has a qualified right of choice of counsel. See <u>Wheat v. United States</u>, 486 U.S. 153, 159 (1988); <u>see</u> <u>also</u> <u>United States v. Gonzalez-Lopez</u>, 548 U.S. 140, 147-48 (2006)("Where the right to be assisted by counsel of one's choice is wrongly denied, therefore, it is unnecessary to conduct an ineffectiveness or prejudice inquiry to establish a Sixth Amendment violation."). "[W]hile the right to select and be represented by one's preferred attorney is comprehended by the Sixth Amendment, the essential aim of the Amendment is to guarantee an effective advocate for each

27

criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat, supra. The right to counsel of choice is "circumscribed in several important respects. . . . [A] defendant may not insist on representation by an attorney he cannot afford or who for other reasons declines to represent the defendant." Id. Moreover, a "defendant's exercise of this right cannot unduly hinder the fair, efficient and orderly administration of justice." United States v. Walters, 309 F.3d 589, 592 (9th Cir. 2002).

Trial courts are accorded broad discretion on matters regarding continuances. See Morris v. Slappy, 461 U.S. 1, 11-12 (1983); Ungar v. Sarafite, 376 U.S. 575, 589 (1964). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' " violates a defendant's rights. See Morris, supra; Armant v. Marquez, 772 F.2d 552, 556 (9th Cir. 1985). In Armant, the Ninth Circuit recited the four factors to be considered in determining whether the trial court abused its discretion in denying a requested continuance: (1) the degree of diligence by the Petitioner prior to seeking the continuance; (2) whether the continuance, if granted, would have served a useful purpose; (3) weighing the inconvenience caused to the court or the prosecution if the continuance was granted; and (4) the amount of prejudice suffered by the Petitioner. Armant, 772 F.2d at 556-57. At a minium, Petitioner must show some prejudice suffered from the denial of the continuance. See also Gallego v. McDaniel, 124 F.3d 1065, 1072 (9th Cir. 1997).

//

//

//

b.    Motion for Substitute Counsel

In conducting federal habeas review of a claim directed to the denial of a motion for substitute counsel, the question is not whether the trial court abused its discretion in denying the motion, but rather whether "the conflict between [the Petitioner] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." Schell v. Witek, 218 F.3d 1017, 1026 (9th Cir. 2000). When a defendant complains about an irreconcilable conflict with counsel, the Sixth Amendment requires that the trial court make a thorough inquiry into the reasons for the defendant's dissatisfaction to determine whether the conflict between the defendant and his attorney "prevented effective assistance of counsel." Id.

3.    The California Court of Appeal's Opinion

The California Court of Appeal rejected Petitioner's claim directed to the trial court's denial of his motion for a continuance to retain private counsel, stating:

In this case, [Petitioner] waited until the jury was present to request a continuance for purposes of retaining counsel. [Petitioner] did not have the name of the lawyer or any way of verifying the attorney could go forward with the trial in a short period of time.  [Petitioner] did not demonstrate sufficient circumstances supporting his request

29

to continue the trial. The record does not suggest [Petitioner] made a good faith, diligent effort to retain counsel before trial. As a result, defendant has not met his burden to show the trial court abused its discretion in denying his request for a continuance to secure new counsel.

(July 24, 2007 Lodgment No. 8 at 11).

The California Court of Appeal also rejected Petitioner's claim directed to the trial court's denial of the motion for substitute counsel, stating:

At the time the *Marsden* hearing was conducted, [Petitioner's] reasons for requesting the appointment of new counsel related to Mr. Wenzl's: inability to convince a prosecutor, Ms. Cady, to accept a plea and psychiatric placement; refusal to call the psychiatrist as a witness; failure to interview all the witnesses [Petitioner] suggested; and refusal to make what appears to be a section 995 motion. Mr. Wenzl refuted the claim there had been no meeting for over two months with [Petitioner]. (This occurred after [Petitioner] contradicted his two-month story.) It was also apparent Mr. Wenzl had been involved in [Petitioner's] case and made tactical decisions regarding that representation. In this instance, the trial court provided defendant with the opportunity to set forth any complaints about Mr. Wenzl. The trial court further took comments from Mr. Wenzl, who explained what had occurred regarding the psychiatric report

and plea discussions. The trial court could reasonably
conclude that Mr. Wenzl's representation of [Petitioner] was
neither inadequate nor marked by irreconcilable conflict. The
trial court did not abuse its discretion by denying
[Petitioner's] substitution of counsel motion.

(July 24, 2007 Lodgment No. 8 at 12-13).

   4.   Analysis

   The California Court of Appeal found that Petitioner was not
diligent in seeking retained counsel before trial. See Armant, 772 F.2d
at 556. Although Petitioner was present at the August 26 2002 hearing
at which he was appointed counsel (see CT 83), the September 4, 2002
hearing at which his jury trial was initially scheduled to begin on
October 21, 2002 (see CT 84), and a readiness hearing on October 17,
2002 (see CT 85),[11] he waited until the day before trial commenced
(December 4, 2002) to try to obtain funds from his family members to
retain private counsel (see 2 RT 2, 14, 19). He also apparently waited
until just before trial to have his mother contact attorney Stephen
Blanchfill (see July 24, 2007 Lodgment No. 13, Exhibit I-A [Declaration
of Stephen I. Blanchfill]) -- who represented him at the August 12, 2002
preliminary hearing (see CT 3) -- for purposes of representing him at
trial. Petitioner's claim that "attorney Stephen Blanchfill was present

_____

   [11]   In the Objections, Petitioner correctly notes that the Court
mistakenly stated in the Report and Recommendation that Petitioner was
present at a readiness hearing on November 15, 2002. (See Objections at
20). Petitioner was present at a readiness hearing on October 17, 2002,
but was not present at a readiness hearing on November 15, 2002. (See
CT 85-86).

31

in the courtroom and ready to substitute as [Petitioner's] lawyer," when Petitioner moved for a continuance (see Traverse at 34), is questionable given Stephen Blanchfill's declared statement that when he went to court, "the jury was already impaneled" and contradicts the record which reflects that the jury was not already impaneled when Petitioner announced that private counsel had left the courtroom (see 2 RT 301). Even if Petitioner's assertions were true, Petitioner did not ever provide the trial court with the name of any lawyer who was willing to represent him, or tell the trial court that a private lawyer would be ready to proceed with the trial in a short period.

Moreover, it not clear that a continuance would have served a useful purpose. See Armant, supra. This is because Petitioner did not tell the trial court that he had obtained funds to retain private counsel, or guarantee that he would obtain funds to retain private counsel. In fact, it can be inferred that private counsel left the courtroom due to Petitioner's inability to obtain the necessary funds. (See 2 RT 301).

Although it is also not clear whether a continuance would have inconvenienced the trial court or the prosecution, it does not appear that Petitioner's defense suffered as a result of the trial court's denial of his request. See Armant, 772 F.2d at 556-57. In any event, Petitioner has failed to allege or show how he was prejudiced by the denial. Thus, the California Court of Appeal's findings are supported by the record.

The record also supports the California Court of Appeal's reasoning

32

and its findings concerning the trial court's denial of Petitioner's motion for substitute counsel. The trial court conducted a hearing on Petitioner's motion for substitute counsel during which Petitioner voiced his complaints about counsel, the trial court inquired about Petitioner's complaints and considered the responses provided by Petitioner's counsel before denying the motion.

Petitioner's complaints against his counsel stemmed from his disagreements with counsel over strategic trial decisions. See Schell, 218 F.3d at 1026 n.8 (quoting Brookhart v. Janis, 384 U.S. 1, 8 (1966) (Harlan, J., dissenting in part))("'[A] lawyer may properly make a tactical determination of how to run a trial even in the face of his client's incomprehension or even explicit disapproval.'"); United States v. Smith, 282 F.3d 758, 763 (9th Cir. 2002)(affirming district court's denial of motion for substitute counsel based, in part, on fact that the disagreement between defendant and counsel was about "strategic purposes."). Petitioner has neither alleged nor shown that any strain in his and his counsel's relationship resulted in a total breakdown of communication or a significant impediment to the attorney client relationship. Moreover, there is no indication in the record that Petitioner's counsel did not competently represent Petitioner at trial. See Morris, 61 U.S. at 13-14 (1983)(The Sixth Amendment requires competent representation and does not guarantee a meaningful relationship between a defendant and counsel); King v. Rowland, 977 F.2d 1354, 1357 (9th Cir. 1992).

The Court finds that the trial court satisfied its obligation to make a thorough inquiry into the reasons for Petitioner's

dissatisfaction with his trial counsel.  The Court further finds that Petitioner has failed to show that, as of the date of the hearing, "the conflict between him and his attorney had become so great that it resulted in a total lack of communication or other significant impediment."  Schell, 218 F.3d at 1026.

Accordingly, the California Supreme Court's rejection of Petitioner's claim directed to the trial court's denials of his motion for a continuance to retain counsel and his motion for substitute counsel was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

**B.    Evidentiary Error and Instructional Error**

Petitioner contends that the trial court's admission of propensity evidence under California Evidence Code § 1108 (Ground Two),[12] and the

---

[12]    Respondent notes that in the state courts Petitioner challenged the trial court's admission of propensity evidence under two different theories.  (See Return at 11, 28-29).  However, it appears, from the face of the Petition, that the evidentiary error claim alleged in the Petition is the same claim that Petitioner raised on direct appeal to the California Court of Appeal and in his Petition for Review to the California Supreme Court. (See Respondent's September 24, 2014 Notice of Lodging No. 2 at 22-27; compare July 24, 2007 Notice of Lodgment No. 9 at 13-18).

To the extent that Petitioner is contending that the trial court improperly admitted propensity evidence under California law, his claim is not cognizable on federal habeas review.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  To the extent that Petitioner is contending that the trial court erred in admitting prior uncharged sexual misconduct as propensity evidence, the Court concurs with Respondent (see Return at 29-33) that Petitioner's claim arguably is barred by Teague v. Lane, 489 U.S. 288, 316 (1989)(a new constitutional rule of criminal procedure cannot be retroactively applied in a habeas proceeding, unless the new rule falls within one of two narrow exceptions).  See Estelle v. McGuire, 502 U.S. at 75 n.5 ("[W]e express
(continued...)

trial court's failure to *sua sponte* instruct the jury on the lesser-included offense of annoying or molesting a child (P.C. § 647.6(a)) (Ground Four) violated his federal constitutional rights to a fair trial and to due process. (Petition at 6).[13]

Respondent alleges that the evidentiary error and instructional error claims alleged in the Petition are procedurally defaulted. (See Return at 29, 33-38, 60, 62-63).[14]

In order for a claim to be procedurally barred for federal habeas corpus purposes, the opinion of the last state court rendering a

---

[12] (...continued)
no opinion on whether a state law would violate the Due Process Clause if it permitted the use of "prior crimes" evidence to show propensity to commit a charged crime."); Groen v Busby, 886 F.Supp.2d 1150, 1158-59 (C.D. Cal. July 27, 2012)(Petitioner's challenge to the admission of his two prior sexual offenses under P.C. § 1108 was barred by Teague).

[13] To the extent that Petitioner is contending that the trial court had a duty to *sua sponte* instruct the jury on the lesser-included offense of annoying or molesting a child, the Court concurs with Respondent (see Return at 60-62) that Petitioner's claim is barred by Teague. See Keeble v. United States, 412 U.S. 205, 213 (1973)(Supreme Court made clear that it had never explicitly held, and was not holding, that the Fifth Amendment due process clause guaranteed the right of a defendant to have the jury instructed on a lesser included offense); see also, e.g., Solis v. Garcia, 219 F.3d 922, 928-29 (9th Cir. 2000); Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998)("Under the law of this circuit, the failure of a state court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995)(the Ninth Circuit "has declined to find constitutional error arising from the failure to instruct on a lesser included offense in a noncapital case," and to hold otherwise would create a new rule in violation of Teague), overruled on other grds, Tolbert v. Page, 182 F.3d 677 (9th Cir. 1999).

[14] Since Petitioner did not challenge Respondent's contention that the evidentiary error and instructional error claims are procedurally barred in the Traverse, and did not even address those claims on the merits, Petitioner has apparently conceded that those claims are procedurally defaulted.

judgment in the case must clearly and expressly state that its judgment rests on a state procedural bar. Harris v. Reed, 489 U.S. 255, 263 (1989); see also Coleman v. Thompson, 501 U.S. 722, 729-30 (1991); Thomas v. Goldsmith, 979 F.2d 746, 749 (9th Cir. 1992).[15]

Under California law, the failure to interpose a specific and timely objection in the trial court on the ground advanced on review independently serves as a procedural bar to consideration of the issue by the appellate courts. See, e.g., People v. Boyette, 29 Cal.4th 381, 430 (2002); People v. Alvarez, 14 Cal.4th 155, 186 (1996); People v. Rodrigues, 8 Cal.4th 1060, 1193 (1994); People v. Saunders, 5 Cal.4th 580, 590 (1993).

Here, the California Court of Appeal "clearly and expressly" invoked the contemporaneous objection procedural bar when it rejected Petitioner's evidentiary error claim, stating: "Preliminarily, defendant's constitutional contention was not the basis of an objection in the trial court and thus is the subject of waiver, forfeiture, and procedural default." (See July 24, 2007 Lodgment No. 8 at 14-15).[16]

---

[15] When a state court rejects a claim as procedural defaulted, that ruling is binding on the federal court even if the state court also addresses the merits of the federal claim in an alternative holding. See Harris v. Reed, 489 U.S. 255, 264 n.10; Carringer v. Lewis, 971 F.2d 329, 333 (9th Cir. 1992)(en banc).

[16] The California Supreme Court's summary denials of Petitioner's July 19, 2004 habeas petition and Petitioner's Petition for Review (see July 24, 2007 Lodgment Nos. 12, 14), both of which alleged Ground Two (see Lodgment Nos. 9, 13), constitutes an adoption of the California Court of Appeal's rejection of Petitioner's claim on procedural grounds. See Thomas v. Goldsmith, supra ("If the intermediate appellate court judgment rests on procedural default and the state Supreme Court denies review without explanation, the federal courts will consider the claim procedurally defaulted.").

This rule is an independent and adequate procedural ground and has been regularly and consistently applied. <u>See</u> <u>Tong Xiong v. Felker</u>, 681 F.3d 1067, 1075 (9th Cir. 2012); <u>Fairbanks v. Ayers</u>, 650 F.3d 1243, 1256-57 (9th Cir. 2011)(California consistently applies its contemporaneous objection rule when a party fails to object to the admission of evidence).

The California Supreme Court "clearly and expressly" invoked the procedural bar of untimeliness when it rejected Petitioner's instructional error claim (alleged in his July 9, 2007 California Supreme Court habeas petition (Case No. 154266), <u>see</u> July 24, 2007 Notice of Lodging Nos. 23-24) with citations to <u>In re Robbins</u>, 18 Cal.4th 770, 780 (1998) and <u>In re Clark</u>, 5 Cal.4th 750 (1993) (<u>see</u> Respondent's September 24, 2014 Notice of Lodging No. 5). <u>See</u> <u>Walker v. Martin</u>, 526 U.S. 307, 313 (2011) ("A summary denial citing <u>Clark</u> and <u>Robbins</u> means that the petition is rejected as untimely"). California's timeliness rule is firmly established and consistently applied. <u>See</u> <u>id.</u> at 317-20.

The failure to comply with a state's contemporaneous objection rule and/or timeliness rule results in a procedural default which bars federal consideration of the issues, unless Petitioner can demonstrate both "cause" for his failure to file a timely habeas petition and "prejudice" accruing from the error. <u>See</u> <u>Wainwright v. Sykes</u>, 433 U.S. 72, 87 (1977); <u>Hines v. Enomoto</u>, 658 F.2d 667, 673 (9th Cir. 1989).

In order to demonstrate "cause" for a procedural default, Petitioner must show "that some objective factor external to the defense

impeded counsel's efforts to comply with the State's procedural rule." _Murray v. Carrier_, 477 U.S. 478, 488 (1986).

Here, Petitioner has not even attempted to show "cause" for his procedural defaults. Because Petitioner must demonstrate _both_ cause and prejudice, see _Murray_, 477 U.S. at 494, his inability to demonstrate the requisite "cause" for his procedural default obviates the need for the Court to even reach the issue of whether Petitioner has demonstrated the requisite "prejudice." See _Thomas v. Lewis_, 945 F.2d 1119, 1123 n.10 (9th Cir. 1991).

The Supreme Court has recognized an exception to the requirement that the Petitioner demonstrate both "cause" and "prejudice," where the Petitioner can demonstrate that failure to consider the procedurally defaulted claims will result in a fundamental miscarriage of justice because he is actually innocent of the crimes of which he was convicted. See, _e.g._, _Coleman_, 501 U.S. at 750; _Murray_, 477 U.S. at 496; _Noltie v. Peterson_, 9 F.3d 802, 806 (9th Cir. 1993). However, in order to qualify for this "miscarriage of justice" exception, the Petitioner must "support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." _Schlup v. Delo_, 513 U.S. 298, 324 (1995)(recognizing that such evidence "is obviously unavailable in the vast majority of cases"). Further, to establish the requisite probability that a constitutional violation probably has resulted in the conviction of one who is actually innocent, "the Petitioner must show that it is more likely than not that no reasonable juror would have

convicted him in light of the new evidence." <u>Id.</u> at 327. Here, Petitioner has not even purported to adduce any new reliable evidence or make the requisite showing of actual innocence.

The Court finds that Petitioner's evidentiary error and instructional error claims are procedurally defaulted. This determination renders it unnecessary for the Court to address those claims on their merits.

## C. Ineffective Assistance of Counsel

In Ground Three, Petitioner contends that his trial counsel was ineffective for failing to interview and/or call witnesses (Ground Three (A)), and for advising Petitioner not to testify (Ground Three (B)). (Petition at 6; Traverse at 4-28).

In the Traverse and Supporting Reply, Petitioner contends that his trial counsel was ineffective for failing to request a lesser-included offense instruction (Ground Three (C)). (<u>See</u> Traverse at 8, 24-28; Supporting Reply at 9-11).

In <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the Supreme Court held that there are two components to an ineffective assistance of counsel claim: "deficient performance" and "prejudice."

"Deficient performance" in this context means unreasonable representation falling below professional norms prevailing at the time of trial. <u>See</u> <u>id.</u> at 688-89. To show "deficient performance,"

39

Petitioner must overcome a "strong presumption" that his lawyer "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." See id. at 690. Further, Petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Id. The Court must then "determine whether, in light of all the circumstances, the identified acts or omissions were outside the range of professionally competent assistance." Id.

To meet his burden of showing the distinctive kind of "prejudice" required by Strickland, Petitioner must affirmatively "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694; see also Williams v. Taylor, 529 U.S. 362, 390-91 (2000).

1. Failing to Interview and/or Call Witnesses to Testify

Although the Petition does not identify the witnesses that Petitioner contends his trial counsel failed to interview and call to testify at trial, Petitioner identified the following witnesses for his defense in his state court pleadings (See July 24, 2007 Notice of Lodging No. 2 at 4-5, 10-11, No. 13 at 4-5, 14-15, No. 15 [Supplemental Memorandum] at 17, 31): Pedram Borhan (Petitioner's brother); Makda Gheysar (Petitioner's fiancée); Delia Villanueva (Petitioner's former employee and the mother of his daughter); "witnesses who could have verified Petitioner's dance training or his former work as a

professional dance instructor;" "psychiatric witnesses or witnesses to Petitioner's psychiatric state;" "the parents of the complaining witnesses;" and Jose Gonzalez. (Petition at 6; Traverse at 16-24).[17]

In order to show ineffective assistance of counsel based on the failure to call witnesses, Petitioner must show that particular witnesses were willing to testify (see United States v. Harden, 846 F.2d 1229, 1231-32 (9th Cir. 1988)), what their testimony would have been (see United States v. Berry, 814 F.2d 1406, 1409 (9th Cir. 1987)); and that their testimony would have been sufficient to create a reasonable doubt as to guilt (see Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990)).

In a habeas petition filed in the California Court of Appeal on November 14, 2003 and his July 19, 2004 California Supreme Court habeas petition, Petitioner claimed the following: (1) Pedram Borham (his brother) would have testified as to "Petitioner's status as president of a water filtration company, Petitioner's participation in ongoing family

---

[17]    Although Petitioner attached an undated Declaration of John Pantermuehl to his October 7, 2004 California Supreme Court habeas petition, the Court will not separately address Mr. Pantermuehl because it does not appear that Petitioner discussed Mr. Pantermuehl or Mr. Pantermuehl's testimony in that habeas petition (see July 24, 2007 Notice of Lodging No. 15).    In any event, the statements in the Declaration of Mr. Pantermeuhl essentially mirror the statements in the Declaration of Jose Gonzalez which are discussed *infra*.

    To the extent that Petitioner's allegations of ineffective assistance of trial counsel asserted in the Traverse were not presented to the California courts, the Court will disregard them.    In addition, the Court is not able to consider any documents that were included in the Traverse but were not presented to or considered by the state courts (see Traverse at 20, Exhibit 2 ["The Royal Ballet School's Policy on Appropriate Physical Contact in Dance"]). See Cullen v. Pinholster, 563 U.S. at 180-85.

41

and individual therapy sessions, and his own availability and the availability of Petitioner's mother to testify as to Petitioner's good character." (<u>See</u> July 24, 2007 Notice of Lodgment No. 2 at 4, No. 13 at 5; <u>see</u> <u>also</u> Traverse at 18-19, 21);[18] (2) Makda Gheysar (his fiancée) would have testified as to "Petitioner's good character, specifically as it relates to his treatment of women, and to the depression Petitioner suffered during the time of his prior offenses." (<u>See</u> July 24, 2007 Notice of Lodgment No. 2 at 4, No. 13 at 5);[19] and (3) Delia Villaneuva

---

[18]    The Declaration of Pedram Borhan, dated October 8, 2003, attached to Petitioner's state habeas petitions, includes the following statements:

> 3.    During the time of the incidents for which my brother was charged and convicted, I was aware that he was president of Diamond Water Treatment, Inc., which had over forty employees, including salespeople, telemarketers and convassers. I had briefly worked with my brother in that company.
> 4.    While working with my brother, I was aware he was financing water filters with three different companies from 1995 to 2000; he financed only twenty filters with prosecution witness, Jose Gonzales, President of Continental Water Softener Company, during the three months he did business with Mr. Gonzalez's company.
> 5.    My brother suffered from severe depression in 1998; I was aware he was seeing a psychologist from 1999 to 2000 on a weekly basis, in addition to our weekly family therapy, which included my brother, myself, and our mother.
>                                  * * * * *
> 9.    I gave Mr. Wenzl the names of a number of witnesses who could have testified for my brother, including Delvia Silva, the mother of his six-year-old daughter; his fiancee, Makda Gheysar; and Flavio Rodriguez, a ballroom dance instructor and modeling agency manager.

(<u>See</u> July 27, 2007 Notice of Lodgment No. 2, Exhibit "F," No. 13, Exhibit "F.")

[19]    The Declaration of Makda Gheysar, dated September 11, 2003, attached to Petitioner's state habeas petitions, includes the following statements:

> 1.    . . . I would be available to testify and give the jury an indication of his character and the changes he has gone through the past few years . . . .

(continued...)

42

(Petitioner's former employee and Petitioner's daughter's mother) would have "attest[ed] to Petitioner's good character and his status as president of his own water filtration company."[20]

---

[19] (...continued)

2.  I have been in contact with [Petitioner] during the past two years and we are planning to start our lives together when he is released. I have witnessed the changes he has gone through to make himself a valuable and essential part of the society.

3.  He went through a deep depression which led him to the Long Beach case with regards to sexual misconduct. He seeked (sic) appropriate medical treatment and with reading, meditation and concentration on his faults and shortcomings, he has made enormous changes. [¶] He is ashamed of his past life and behavior and has become an individual with deep integrity, honesty, accepting, respectful with an open mind and soul.

(See July 24, 2007 Notice of Lodgment No. 2, Exhibit "G-1", No. 13, Exhibit "G-1").

According to Petitioner, Makda Gheysar's testimony, "together with the evidence that [Petitioner] did not have a sexual intent during the instant offense, would have negated the propensity inference from the prior incidents by explaining that his mental state at the time of those incidents was vastly different than it was by the year 2000, when the charged conduct occurred." (See Traverse at 23).

The Court construes the references to Petitioner's prior offenses by the various witnesses he claims trial counsel failed to call as references to the uncharged 1998 offenses (evidence of which was introduced at trial), rather than Petitioner's 1999 sexual battery conviction (see sealed Probation Report at 5).

[20] The Declaration of Delia Villaneuva, dated August 13, 2003, attached to Petitioner's state habeas petitions, includes the following statements:

1.  I worked and lived with [Petitioner] in 1997. He was president of Diamond Water Treatment Inc. with many employees and sales people. He was very kind and helpful to all employees. He bought and financed his filters from few different supplies (sic) and manufacturess (sic).

2.  When we separate (sic), I came to Guadalajara where our daughter was borned (sic). In year 2000 he came to Guadalajara to be with his daughter.

(continued...)

43

Petitioner alleged that without any character witnesses, "Petitioner's jury heard only of Petitioner's criminal disposition, and knew nothing of his exemplary character as brother, father, or fiancee, which would have militated against the disposition evidence adduced by the State." Petitioner further alleged that absent witnesses to testify that "Petitioner owned his own water filtration company or worked as a sales representative for several other companies, both of which would have established Petitioner as a legitimate businessman and the legitimacy of the need to audition potential commercial models," "the prosecutor was able to argue, without contravening evidence, Petitioner was a fraud, and his business fictitious, conjured simply to facilitate preying on young women." (<u>See</u> July 24, 2007 Notice of Lodgment No. 2 at 5, 10, No. 13 at 5, 15; <u>see</u> <u>also</u> Traverse at 18-19).

In a habeas petition filed with the California Court of Appeal on November 14, 2003 and his July 19, 2004 California Supreme Court habeas petition, Petitioner also claimed that he was harmed by his trial counsel's failure to (1) call "witnesses who could have verified Petitioner's dance training or his former work as a professional dance instructor," because "Petitioner had a potential factual defense in demonstrating that the way he touched the complainant's chests was a common technique used by dance instructors to correct a dancer's posture," (<u>see</u> July 24, 2007 Notice of Lodgment No. 2 at 10, No. 13 at

---

[20] (...continued)
(<u>See</u> July 24, 2007 Notice of Lodgment No. 2, Exhibit "G-2", No. 13, Exhibit "G-2").

14);[21] (2) call "psychiatric witnesses or witnesses to Petitioner's psychiatric state, to attested (sic) to his depression at the time of the prior offenses, showing them anomalous incidents rather than dispositive traits," (see July 24, 2007 Notice of Lodgment No. 2 at 10-11, No. 13 at 15); and (3) call Valene's parents to testify, even though Petitioner had "explained to counsel his belief [that] the allegations of misconduct were prompted by a contract dispute with the water filtration company Petitioner was representing." (See July 24, 2007 Notice of Lodgment No. 2 at 11, No. 13 at 15). Petitioner claims that Valene's father "could have offered testimony that would establish that [Petitioner] conducted the audition, not under a ruse to commit sexual misconduct, but to secure a business relationship with the parents because they were refusing to sign the financing contract for the installed filter until [Petitioner] had completed his promise to hold the audition for their daughter." (See Traverse at 22).

In his October 7, 2004 California Supreme Court habeas petition, as supplemented by a May 2, 2005 memorandum, Petitioner appeared to claim that Jose Gonzalez, the President of Continental Water Softener Company, would have testified that Petitioner was the President of Diamond Water Treatment, Inc., as opposed to just being a salesman for Continental

---

[21] Petitioner claims that testimony that Petitioner was "trained as a ballroom dance instructor for one year at the Fred Astaire and Arthur Murray dance studios" and testimony about "the importance of correct posture, or of the touching ordinarily done to correct posture, would have shown [Petitioner's] actions were typical of dance instructors," and "provided the jury with a legitimate and non-sexual basis for [Petitioner's] contact with Valene and Gelesia during the audition." (See Traverse at 20, quoting statements in Petitioner's Declaration dated October 3, 2003 [see July 24, 2007 Notice of Lodgment No. 2, Exhibit "E", No. 13, Exhibit "E"]).

Water Softener Company. (See July 24, 2007 Notice of Lodgment No. 15 [Supplemental Memorandum] at 16-17, 31; see also Traverse at 18-19).[22] According to Petitioner, such testimony would have mitigated the damaging effect of Jose Gonzalez's trial testimony that in 2000 Petitioner, a subcontractor/salesman for Continental Water Softener Company, was not authorized to audition anybody for commercials or modeling advertising jobs (see 3 RT 903-04), because such testimony would show that Petitioner, as the president of his own company, "had a legitimate purpose for conducting an audition." (See Traverse at 18-19).

There is nothing in the record to support Petitioner's claim that Jose Gonzalez, unidentified dance instructors (except for Flavio Rodriguez who was identified in the Declaration of Pedram Borham), unidentified psychiatrists/psychologists, and Valene's father would have testified at trial in conformity with Petitioner's representations. Moreover, Petitioner has failed to show that the testimony of any of the above witnesses would have been sufficient to create a reasonable doubt as to Petitioner's guilt. See Tinsley v. Borg, 895 F.2d 520, 532 (9th Cir. 1990).

---

[22] The Declaration of Jose Gonzalez, dated November 11, 2003, attached to Petitioner's October 7, 2004 California Supreme Court habeas petition, includes the following statements:

1. [Petitioner] was the President of Diamond Water Treatment, Inc.
2. [Petitioner] had his own office, his own marketing staff/convassers. He trained independently.
3. [Petitioner] sold water filters from Continental Water Softener from time to time on an independent contractor basis. Records of customers are available on request.

(See July 24, 2007 Notice of Lodgment No. 15, Exhibit "D").

46

Moreover, as set forth below, testimony from Pedram Borhan, Makda Gheysar, and/or Delia Villaneuva about Petitioner's good character with women and/or Petitioner's psychiatric state, whether at the time of the present offenses (2000) or at the time his 1998 uncharged offenses, would have had little, if any, relevance to Petitioner's case.

First, it is unclear whether Pedram Borhan (Petitioner's brother) would have been able to testify as to Petitioner's psychiatric state in 2000 or in 1998. According to Pedram Borham's declaration, Petitioner suffered from severe depression in 1998, and he was aware Petitioner was seeing a psychologist in 1999 and 2000 at least twice a week. (<u>See</u> July 24, 2007 Notice of Lodgment No. 2, Exhibit "F"). However, he does not state that Petitioner suffered "severe depression" in 2000, or that Petitioner's psychiatric state was a factor in the commission of the 2000 or 1998 offenses.

Second, it does not appear that Makda Gheysar (Petitioner's fiancée) would have been able to testify as to Petitioner's character or psychiatric state in 2000 or in 1998. In her declaration, dated September 11, 2003, Geysar stated that she had "been in contact with [Petitioner] during the past 2 years." (<u>See</u> July 24, 2007 Notice of Lodgment No. 2, Exhibit "G-1"). Moreover, Gheysar did not state how Petitioner's "deep depression" contributed to his committing the 2000 or 1998 offenses. Similarly, it is unclear whether Delia Villanueva (Petitioner's former employee and mother of his daughter) would have been able to testify about Petitioner's character or psychiatric state in 2000 or in 1998. In her declaration, Villanueva fails to state when she separated from and moved away from Petitioner or even indicate that

she knew of Petitioner's character or psychiatric state in 2000 or in 1998. (See July 24, 2007 Notice of Lodgment No. 2, Exhibit "G-2").

Third, although Petitioner does not specify the testimony that would have been given about his good character, it is likely that any testimony about his good character with women would have opened the door to damaging rebuttal evidence, to include Petitioner's 1997 misdemeanor convictions for sexual battery and lascivious act against a child under 14 years of age, as well as his 1999 conviction for sexual battery (see Return at 51-52, citing to 2 RT 313 and the sealed Probation Report at 2-3). See People v. Kennedy, 36 Cal.4th 595, 634 (2005)("[T]he prosecution may cross-examine a defense character witness about acts inconsistent with the witness's testimony as long as the prosecution has a good faith belief that such acts actually occurred."), disapproved on other grounds by, People v. Williams, 49 Cal.4th 405 (2010); Cal. Evid. Code 1102(c).

Fourth, it is unlikely that any testimony by Pedram Borhan, Makda Gheysar and/or Delia Villaneuva or any psychiatrist or psychologist about Petitioner's psychiatric state, whether at the time of the present offenses or the prior offenses, would have been helpful to Petitioner's defense, in light of the trial court's instruction to the jury that a finding, by a preponderance of the evidence, that Petitioner committed the prior sexual offenses was not sufficient by itself to prove beyond a reasonable doubt that Petitioner committed the present offenses (see 4 RT 969-72; CT 130-35). Moreover, Petitioner has failed to allege how an improvement in Petitioner's psychiatric state since the time of the prior offenses would have resulted in a different outcome at the trial

of his present offenses.

Fifth, testimony from Valene's father concerning the reason for making an allegation of misconduct against Petitioner (according to Petitioner, it was related to a contract dispute between Valene's parents and a filtration company Petitioner was representing, see Traverse at 22, 30) would not have been relevant to the issue of Petitioner's guilt. The evidence presented at trial was that *after* Petitioner had met with Valene's father at Valene's father's house in La Puenta concerning water filter installation, the father sent Petitioner to Valene's mother's house in Irwindale (where Valene lived) presumably about an audition for a commercial and a couple of days later, Petitioner showed up at Valene's mother's house to conduct an audition. (See 3 RT 618-21, 627, 644-45, 699). Not only is there no competent evidence about a contract dispute involving Valene's father, but there is also no evidence that Valene, Galesia, Vanessa, and/or Valene's mother were aware of any alleged contract dispute involving Valene's father. In any event, even if testimony from Valene's father about a contract dispute was relevant (i.e., as motivation for making an allegation against Petitioner, or as providing Petitioner with a "legitimate, non-sexual reason to conduct an audition – to further his own business," see Traverse at 22, 30), the jury nonetheless would have been presented with overwhelming evidence of Petitioner's guilt.

Sixth, although testimony about Petitioner's status as President of Diamond Water Treatment, Inc., his work as a sales representative for other companies, and his training as a dance instructor may have been relevant to Petitioner's defense that his "touchings were misconstrued

49

and were within the realm of proper touching for dance instruction" (see July 24, 2007 Notice of Lodgment No. 2, Exhibit "E" [Petitioner's Declaration] at ¶ 4; see also 4 RT 987-1000 [Petitioner's trial counsel argued that the prosecutor did not establish specific sexual intent, and that Petitioner's touching (which counsel called "inadvertent") during an audition was for a legitimate purpose]), such testimony would not have been sufficient to create a reasonable doubt as to Petitioner's guilt, given the following testimony: (1) Valene's and Galesia's testimony about Petitioner's inappropriate touching of them (see 3 RT 618-42, 652, 654-56, 660-63, 666 [Valene's testimony], 668-82, 686-90, 695 [Galesia's testimony]; (2) Vanessa's testimony corroborating Valene's account (see 3 RT 698-708, 713, 720-27); and (3) the testimony of three young women (Song Lor, Cythia Tejada and Brenda Castillo) about Petitioner's inappropriate touching of them in 1998 under similar circumstances (see 4 RT 910-17, 921-28, 937-44).

Seventh, even if testimony about Petitioner's status as President of Diamond Water Treatment, Inc., and his work as a sales representative for other companies would have lessened the damaging effect of Jose Gonzalez's trial testimony that Petitioner was not authorized by Continental Water Softener Company to audition anybody for commercials or modeling advertising jobs, there simply was no evidence presented at trial - and no witness has claimed that they would testify - that at the time of the present offenses Petitioner was conducting dance auditions for the purpose of making commercials for Diamond Water Treatment, Inc. Moreover, any such testimony would have been undermined by the fact that Petitioner told Valene that the dance was part of a commercial for a company called Golden Water (see 3 RT 619, 627), Petitioner told Cynthia

Tejada that he was a talent scout for an agency (see 4 RT 922-24), and Petitioner told Brenda Castillo that he was a modeling contractor (see 4 RT 939). Thus, contrary to Petitioner's assertion (see Traverse at 29-30), such testimony would not have lessened the impact of the prosecutor's argument that Petitioner's audition was a pretext and did not serve any legitimate purpose (see 4 RT 985).

Finally, any testimony that Petitioner's touching was part of a legitimate dance instruction would not have been credible, in light of the trial testimony that (1) Petitioner told Valene to sit on his lap and tell him, "I love you daddy" (see 3 RT 639-40); (2) Petitioner intentionally pressed his knee to Valene's vaginal area during a dip (see 3 RT 626, 628-30, 639-40, 660-61, 673-76, 681, 695, 704-07, 720-25); (3) Petitioner intentionally and with cupped hands touched Valene's and Gelesia's breasts (see 3 RT 641, 670-73, 675-77, 681-82, 686-87, 695, 700-02, 708, 725-27); (4) Petitioner was enjoying himself during his "touching" encounters with both Valene and Galene (see 3 RT 635-37, 661-62, 672-73, 675, 678, 702-03); and (5) Petitioner's inappropriate touching of the three other young women during what were purported to be auditions.

The California Court of Appeal's finding that Petitioner failed to show a reasonable probability that, but for his trial counsel's failure to call the above witnesses to testify, the result of his trial would have been different is amply support by the record (see July 24, 2007 Lodgment No. 3).

Petitioner's failure to make the requisite showing of "prejudice"

51

with respect to his ineffective assistance of trial counsel claim renders it unnecessary for the Court to address the "deficient performance" issue. See Strickland, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed."); see also Williams v. Calderon, 52 F.3d 1465, 1470 n.3 (9th Cir. 1995).

Accordingly, the California Supreme Court's rejection of Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to call Pedram Borhan, Makda Gheysar, Delia Villaneuva, dance instructors, psychiatric witnesses, and Valene's father to testify at trial was neither contrary to, nor involved an unreasonable application of, clearly established federal law.[23]

Furthermore, the Court finds, based on an independent review of the

---

[23] Contrary to Petitioner's assertion (see Traverse at 9-10, 16), this Court's review of Petitioner's ineffective assistance of trial counsel claim is not de novo. The California Court of Appeal denied Petitioner's ineffective assistance of counsel claim, at least with respect to the claim that trial counsel failed to call certain witnesses -- (Pedram Borhan, Makda Gheysar, Delia Villaneuva, "witnesses who could have verified Petitioner's dance training or his former work as a professional dance instructor", "psychiatric witnesses or witnesses to Petitioner's psychiatric state," and "the parents of the complaining witnesses" to testify at trial) and the claim that trial counsel advised Petitioner not to testify at trial, see July 24, 2007 Notice of Lodgment No. 2, No. 13) -- in a reasoned decision (see July 24, 2007 Notice of Lodgment No. 3), and the California Supreme Court summarily denied Petitioner's habeas petition raising these claims without citation to authority (see July 24, 2007 Notice of Lodgement No. 14).

Petitioner's raised his ineffective assistance of counsel claim based on his trial counsel's failure to call other witnesses (Jose Gonzalez and John Pantermuehl) to testify at trial in his October 7, 2004 habeas petition to California Supreme Court (see July 24, 2007 Notice of Lodgment No. 15), which was summarily denied without citation to authority on June 8, 2005 (see July 24, 2007 Notice of Lodgment No. 16).

record, that the California Supreme Court's rejection of Petitioner's ineffective assistance of counsel claim based on his trial counsel's failure to call Jose Gonzalez to testify at trial was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

## 2. Advising Petitioner Not to Testify

Petitioner contends that his trial counsel was ineffective for advising him at the "eleventh hour" not to testify even though there was no other affirmative defense available. (See Petition at 6; Traverse at 24). In his November 14, 2003 California Court of Appeal habeas petition and his July 19, 2004 California Supreme Court habeas petition, Petitioner alleged, "Petitioner wanted to testify, but Mr. Wenzl refused to let him do so." (See July 24, 2007 Notice of Lodgment No. 2 at 4, No. 13 at 4).[24]

However, Petitioner does not state what testimony he would have given at trial in his declaration dated October 10, 2003. Petitioner also fails to allege, in his Petition and Traverse, how his testimony would have impacted the case. Even if Petitioner had testified at trial about a number of the issues discussed in his petition, including his status in his company, his past and present psychiatric issues, his dance training, and the motivation for Valene's parents to make an

---

[24] Petitioner's Declaration (with Petitioner's name misspelled) dated October 10, 2003, (attached to Petitioner's state petition) states, "Mr. Wenzl continuously assured me I could testify and explain my actions to the jury. When the time came, Mr. Wenzl refused to let me take the stand." (See July 24, 2007 Notice of Lodgment No. 2, Exhibit "E", No. 13, Exhibit "E.").

53

allegation against him), he would have been faced with significant impeachment evidence, including (1) Petitioner's statements at the Marsden hearing, discussed above, that he had no recollection of the events (see 1 RT 8, 14); and (2) Petitioner's 1999 sexual battery conviction (see 2 RT 313 and the sealed Probation Report at 2). Under these circumstances, and given the overwhelming evidence of Petitioner's guilt presented at trial, Petitioner cannot show that he suffered "prejudice" as a result of his trial counsel's alleged advice not to testify.

The California Court of Appeal's finding that Petitioner failed to establish "prejudice" with respect to this ineffective assistance of trial counsel claim (see July 24, 2007 Notice of Lodgment No. 3) was supported by the record.[25]

Accordingly, the California Supreme Court's rejection of this ineffective assistance of trial counsel claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

3.   Failing to Request the Lesser-Included Offense Instruction

Petitioner contends that his trial counsel was ineffective for failing to request that the trial court instruct the jury with P.C. §

---

[25]   The Court's determination that Petitioner has failed to show "prejudice" renders it unnecessary for the Court to address Petitioner's assertions about who made the decision for Petitioner not to testify (see Traverse at 24, citing to July 24, 2007 Notice of Lodgment No. 13, Exhibit "D-1").

647.6(a) (a misdemeanor),[26] a lesser-included offense of P.C. § 288(a).
Petitioner claims that "[h]ad counsel requested a child annoyance
instruction, there is at least a reasonable probability that the jury
would have acquitted [Petitioner] of the greater charge and he would
have avoided a mandatory life sentence." (<u>See</u> Traverse at 8, 24-28;
Supporting Reply at 9-11).

"*Any* touching of a child under the age of 14 violates [P.C. §
288(a)], even if the touching is outwardly innocuous or inoffensive, if
it is accompanied by the *intent* to arouse or gratify the sexual desires
of either the perpetrator or the victim." <u>People v. Lopez</u>, 19 Cal.4th
282, 289 (1998)(italics in original). On the other hand, P.C. 647.6(a)
"does not require a touching . . . but does require (1) conduct a
normal person would unhesitatingly be irritated by . . . and (2) conduct
motivated by an unnatural or abnormal sexual interest in the victim."
<u>Id.</u> (internal citations and internal quotations omitted).

There are two separate tests to determine whether P.C. § 647.6(a)
is a lesser-included offense of P.C. § 288(a) -- the elements test ("[If
a crime cannot be committed without also necessarily committing a lesser
offense, the latter is a lesser included offense within the former") --
and the accusatory pleading test ("[A] lesser included offense is
included within the greater charged offense if the charging allegations
of the accusatory pleading include language describing the offense in

---

[26]    P.C. § 647.6(a)(1) provides that "Every person who annoys or
molests any child under 18 years of age shall be punished by a fine not
exceeding five thousand dollars ($5,000), by imprisonment in a county
jail, not exceeding one year, or by both the fine and imprisonment."

such a way that if committed as specified the lesser offense is necessarily committed."). Id. at 288-89 (internal quotation marks omitted).

Under the elements test, P.C. § 647.6(a) is not a lesser-included offense of P.C. § 288(a). See id. at 290-92 ("The criminal conduct that section 288, subdivision (a), prohibits could occur without necessarily also violating section 647.6, subdivision(a). Section 288, subdivision (a) requires a touching, even one *innocuous or inoffensive* on its face, done with lewd intent. Section 647.6, subdivision (a), on the other hand, requires *an act objectively and unhesitatingly viewed as irritating or disturbing*, prompted by an abnormal sexual interest in children. Clearly, not every touching with lewd intent will produce the objective irritation or annoyance necessary to violate section 647.6.").

Whether P.C. § 647.6(a) is a lesser-included offense of P.C. § 288(a) under the accusatory pleading test is not as clear. In Lopez, supra, the California Supreme Court examined language in the Information -- that the petitioner violated P.C. § 288(a) when he "'touch[ed] victim's vaginal area outside of her underwear' for purposes of his sexual gratification" -- to determine whether P.C. § 647.6(a) was a lesser-included offense of P.C. § 288(a). The court found that such "language does not necessarily allege an *objectively* irritating or annoying act of child molestation, and it could indicate a nonforcible or apparently consensual touching" such as what would occur if "'[a] female child who rides on her father's shoulders might have contact between her vaginal area and her area and her father's neck or shoulders, but that contact would not unhesitatingly irritate or disturb

56

a reasonable person.'" <u>Id.</u> at 293-94.

Here, the Information charging Petitioner alleges, in two separate counts, that Petitioner violated P.C. § 288(a) by "willfully, unlawfully, and lewdly commit[ting] a lewd and lascivious act upon and with the body and certain parts and members thereof of [          ], a child under the age of fourteen years, with the intent of arousing, appealing to, and gratifying the lust, passions, and sexual desires of the said defendant(s) and the said child." (<u>See</u> CT 80-81). Petitioner contends that the broad language in his case distinguishes his case from <u>Lopez</u>: "The pleading . . . includes any 'lewd' or 'lascivious' act, in contrast to the pleading in *Lopez* that specifies only the generic touching of the vaginal area over the victim's clothes.  One cannot 'lewdly' or 'lasciviously' touch a reasonable person without irritating or disturbing that person." (<u>See</u> Traverse at 27-28).

Assuming <u>arguendo</u> that P.C. § 647.6(a) was a lesser-included offense of P.C. § 288(a) under the accusatory pleading test,[27] the Court nonetheless finds that Petitioner is not entitled to federal habeas relief on this claim.  Based on the overwhelming evidence of Petitioner's guilt of the P.C. § 288(a) offenses, as discussed above, Petitioner has failed to meet his burden of showing there is a reasonable probability that, but for his trial counsel's failure to request that the trial court instruct the jury with P.C. § 647.6(a), the outcome of his trial would be different.  The evidence at trial

---

[27]     The Court notes that Respondent did not address the issue of whether P.C. § 647.6(a) was a lesser-included offense of P.C. § 288(a) under the accusatory pleading test (<u>see</u> Return at 63-64; Response to the Traverse at 8-10; Response to the Supporting Reply at 7).

established that Petitioner did far more than merely irritate the victims; in fact, the evidence clearly established that Petitioner touched the victims with the intent to arouse his sexual desires.

Accordingly, based on an independent review of the record,[28] the Court finds that the California Supreme Court's rejection of Petitioner's ineffective assistance of counsel claim based on trial counsel's failure to request a lesser-included offense instruction was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

**D.    Cruel and Unusual Punishment**

In Ground Five, Petitioner contends that his 15-years to life sentence, under California's "One-Strike law" (because his sexual offenses involved two victims),[29] constituted cruel and unusual punishment under the Eighth Amendment.  Petitioner claims that his sentence was disproportionate to the crimes, because the crimes were non-violent and involved, at most, Petitioner touching two girls on the outside of their clothing for 7-10 seconds, during a ten-to-twenty minute audition, and one of the victims -- Galesia -- "really didn't realize what [Petitioner] was trying to do" (see 3 RT 680).  As support for his claim, Petitioner notes that California punishes people

---

[28]    For the same reasons, the Court also finds that Petitioner's claim would fail even under *de novo* review.

[29]    Under California law, a person who is convicted of committing a lewd or lascivious act under P.C. § 288(a) against more than one victim "shall be punished by imprisonment in the state prison for 15 years to life."  See P.C. §§ 667.61(b), (c)(8), (e)(4).

convicted of second degree murder and other offenses (including voluntary manslaughter, kidnapping, mayhem, assault with intent to commit mayhem or rape, assault with caustic chemicals, with intent to injure or disfigure, arson that causes great bodily injury, shooting at an inhabited dwelling, and willful infliction of "unjustifiable physical pain" on a child under circumstances or conditions likely to produce great bodily harm or death) less severely. Petitioner further supports his claim by noting that he rejected the prosecution's three-year offer prior to the preliminary hearing, and rejected the prosecution's ten-year offer immediately prior to the commencement of trial. (Petition at 6; Traverse at 38-42).[30]

In <u>Rummel v. Estelle</u>, 445 U.S. 263, 274 (1980), the Supreme Court stated that "for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative." Noting that it would only employ a proportionality principle in an extreme case (<u>see</u> <u>id.</u> at 274 n.11), the Supreme Court upheld against an Eighth Amendment challenge a mandatory sentence of life imprisonment with the possibility of parole imposed on a Texas recidivist[31] who had been convicted of obtaining

---

[30] Petitioner alleged his Eighth Amendment cruel and unusual punishment claim in his October 7, 2004 California Supreme Court habeas petition, as supplemented by his May 2, 2005 Memorandum. (<u>See</u> July 24, 2007 Notice of Lodgment No. 15 at 13, Supplemental Memorandum at 27-28). The California Supreme Court summarily denied that habeas petition without citation to authority. (<u>See</u> July 24, 2007 Notice of Lodgment No. 16).

[31] The purpose of a recidivist statute was described as follows: ". . . Its primary goals are to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses
(continued...)

$120.75 under false pretenses, after prior convictions for fraudulent use of a credit card to obtain $80 worth of goods or services, and for passing a forged check for $28.36. Id. at 285.

Three years after the Rummel decision, in Solem v. Helm, 463 U.S. 277, 281 (1983), the Supreme Court ruled that the Eighth Amendment prohibited a life sentence without the possibility of parole for a seventh nonviolent felony where the triggering offense was uttering a no account check for $100. The Supreme Court held "as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted," and that "a court's proportionality analysis under the Eighth Amendment should be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." Id. at 290-92. However, the Supreme Court specifically stated in Solem that it was not overruling Rummel, whose facts the Court characterized as "clearly distinguishable." Id. at 288 n.13, 303-04 n.32.

Although there was no majority opinion on the proportionality issue in the Supreme Court's subsequent decision rejecting an Eighth Amendment challenge in Harmelin v. Michigan, 501 U.S. 957 (1991), the Supreme Court construed the Rummel, Solem and Harmelin trilogy of cases as

---

[31] (...continued)
serious enough to be punished as felonies, to segregate that p erson from the rest of society for an extended period of time. This segregation and its duration are based not merely on the person's most recent offense but also on the propensities he has been convicted of and sentenced for other crimes." Rummel, 445 U.S. at 284.

standing for the "clearly established" rule that "[a] gross disproportionality principle is applicable to sentences for terms of years." Lockyer v. Andrade, 538 U.S. 63, 72 (2003). The Supreme Court further observed that the precise contours of the gross disproportionality principle "are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." Id.; see also Graham v. Florida, 560 U.S. 48, 59-60 (2010).

In Andrade, supra, the Supreme Court rejected a state habeas petitioner's Eighth Amendment challenge to a 50 years to life sentence imposed under California's Three Strikes Law, finding that "it was not an unreasonable application of our clearly established law for the California Court of Appeal to affirm Andrade's sentence of two consecutive terms of 25 years to life in prison" for two counts of petty theft. Andrade, 538 U.S. at 77. In Ewing v. California, 538 U.S. 11 (2003), a companion case to Andrade decided the same day, the Court held that a 25 years to life sentence following a third strike conviction for shoplifting three golf clubs worth approximately $1,200, did not violate the Eighth Amendment's prohibition on cruel and unusual punishments, stating, "[i]n weighing the gravity of Ewing's offense, we must place on the scales not only his current felony, but also his long history of felony recidivism." Id. 538 U.S. at 29. The Court concluded that "Ewing's sentence is justified by the State's public-safety interest in incapacitating and deterring recidivist felons, and amply supported by his own long, serious criminal record," and that "Ewing's is not 'the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.'" See id. at 29-31.

Although the Supreme Court has "exhibit[ed] a lack of clarity regarding what factors may indicate gross disproportionality", see Andrade, 538 U.S. at 72, the Court has identified three factors to be considered as part of the disproportionality analysis, as noted above. See Solem, 463 U.S. at 292. However, the Supreme Court has not mandated a comparative analysis within and between jurisdictions. See Ewing, 538 U.S. at 23; Solem, 463 U.S. at 291-92. Where a comparison of the gravity of the offense with the harshness of a sentence does not raise an "inference of gross disproportionality," there is no need to consider the other factors. Harmelin, 501 U.S. at 1005 ("[I]ntrajurisdictional and interjursdictional analyses are appropriate only in the rare case in which a threshold comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality.").

Federal courts should be "reluctant to review legislatively mandated terms of imprisonment for crimes concededly classified and classificable as felonies." Hutto v. Davis, 454 U.S. 370, 374 (1982); see also Rummel, 445 U.S. at 274. "A punishment within legislatively mandated guidelines is presumptively valid." United States v. Mejia-Mesa, 153 F.3d 925, 930 (9th Cir. 1998), citing Rummel, 445 U.S. at 272. "Generally, so long as the sentence imposed does not exceed the statutory maximum, it will not be overturned on eighth amendment grounds." United States v. McDougherty, 920 F.2d 569, 576 (9th Cir. 1990); see also United States v. Cupa-Guillen, 34 F.3d 860, 864 (9th Cir. 1994)("[A] sentence within the limits set by a valid statute may not be overturned on appeal as cruel and unusual punishment unless the sentence is so 'grossly out of proportion to the severity of the crime' as to shock our sense of justice.").

62

"The one strike law was enacted to ensure serious and dangerous sex offenders would receive lengthy prison sentences upon their first conviction." People v. Palmore, 79 Cal.App.4th 1290, 1296 (2000). The one strike law "reflects the Legislature's zero tolerance toward the commission of sexual offenses against particularly vulnerable victims." People v. Alvarado, 87 Cal.App.4th 178, 200-01 (2001).

Although Petitioner's current offenses involved the touching of the two girls on the outside of their clothing for a brief period of time, they are more serious than the obtaining money under false pretenses conviction in Rummel, the petty theft convictions in Andrade, and the shoplifting conviction in Ewing, all of which resulted in longer sentences than what Petitioner received. Moreover, like the Petitioner in Andrade, Petitioner had a criminal history involving sexual misconduct, i.e., 1997 misdemeanor convictions for lewd or lascivious act with a child under the age of 14 and for sexual battery, 1999 conviction for sexual battery (see sealed Probation Report at 2), and other sexual misconduct for which he was not charged.

While Petitioner's sentence may be harsh, Petitioner's case simply is not one of the rare cases where a comparison of the offenses committed and the sentence imposed leads to an inference of gross disproportionality. In light of United States Supreme Court decisions, the Court is unable to find that Petitioner's sentence constituted cruel and unusual punishment in violation of the Eighth Amendment. See Villaneuva v. Frauenheim, 2014 WL 4245914, *7-*11 (C.D. Cal. April 7, 2014)(four consecutive sentences of fifteen years to life for convictions involving four separate acts of forcible lewd conduct on

63

three children was not cruel and unusual punishment, even where Petitioner had no criminal record and his actions involved forcible kissing as opposed to more serious forms of sexual misconduct); <u>Simental v. McEwan</u>, 2014 WL 360191, *14 (C.D. Cal. Jan. 29, 2014)(three consecutive sentences of fifteen years to life for convictions involving three separate acts of child molestation upon two children was not cruel and unusual punishment); <u>Tessier v. Runnels</u>, 2009 WL 1530670, *5-*9 (C.D. Cal. May 26, 2009)(three consecutive sentences of fifteen years to life for convictions involving the molestation of three children did not constitute cruel and unusual punishment, even where Petitioner had no criminal record and his actions did not involve violence); <u>see also</u> <u>Norris v. Morgan</u>, 622 F.3d 1276, 1293 (9th Cir. 2010)(a sentence of life without parole under a "two strike" recidivist statute for a child molestation conviction which involved the touching of the victim's genitalia over her clothing for at most "a couple of seconds" was not cruel and unusual punishment).

Accordingly, based on an independent review of the record, the Court finds that the California Supreme Court's rejection of Petitioner's cruel and unusual punishment claim was neither contrary to, nor involved an unreasonable application of, clearly established federal law.

### VII.  RECOMMENDATION

For the reasons discussed above, it is recommended that the district court issue an Order: (1) accepting this Final Report and Recommendation; (2) denying the Petition for Writ of Habeas Corpus; and

(3) directing that Judgment be entered dismissing this action with prejudice.

DATED: May 5, 2017.


                                    _____/s/_____
                                         ALKA  SAGAR
                                    UNITED STATES MAGISTRATE JUDGE